UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                              :
U.S. COMMODITY FUTURES                        :
TRADING COMMISSION,                           :
                                              :        COMPLAINT FOR INJUNCTIVE AND
              Plaintiff,                       :        OTHER EQUITABLE RELIEF AND FOR
                                              :        CIVIL MONETARY PENALTIES UNDER
       -against-                              :        THE COMMODITY EXCHANGE ACT
                                              :        AND COMMISSION REGULATIONS
HAENA PARK, YUL KASEMAN,                       :
PHAETRA CAPITAL GP LLC a/k/a                   :
ARGENTA CAPITAL GP LLC,                        :
PHAETRA CAPITAL MANAGEMENT                     :
LP a/k/a ARGENTA CAPITAL LLC, and             :
ARGENTA GROUP LLC                             :
                                              :
              Defendants.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


        Plaintiff U.S. Commodity Futures Trading Commission ("Commission") alleges as

follows:

## I.        SUMMARY

        1.      From at least January 2010 through the present (the "Relevant Period"), Haena

Park, individually and as the founder and officer of Phaetra Capital GP LLC ("Phaetra GP"),

Phaetra Capital Management LP ("Phaetra Management", and, collectively with Phaetra GP, the

"Phaetra entities"), and Argenta Group LLC ("Argenta Group", and collectively with Park and

the Phaetra entities, "Pool Defendants"), engaged in at least two fraudulent schemes in violation

of the Commodity Exchange Act ("Act"): (1) the Pool Defendants fraudulently solicited at least

$23 million from members of the public to participate in a commodity pool that traded various

futures contracts, as well as leveraged or margined retail off-exchange foreign currencies, the

latter contracts commonly known as "forex" and (2) Park, as the agent and officer Argenta

Capital LLC, a predecessor of Phaetra Management, duped at least one investment firm to authorize Park to manage the firm's investment account.  Moreover, Park and her partner Yul Kaseman (collectively with Pool Defendants, "Defendants") made false statements to the National Futures Association ("NFA") about the Phaetra entities' activities.

2.     At Park's direction, approximately 50 members of the public ("pool participants") deposited over $23 million into at least 4 bank accounts opened in Park's name and/or controlled by Park.  In soliciting funds from potential and existing pool participants, Park made material misrepresentations and omissions regarding her trading expertise and profits.

3.     Park told the pool participants that they were investing in a pooled investment run by the Phaetra entities and the Argenta Group.  In reality, Park transferred a portion of pool participant funds to a personal trading account opened in Park's name at futures commission merchant ("FCM") Interactive Brokers, where she traded on behalf of a commodity pool ("Park Pool").

4.     Over the Relevant Period, Park's trading on behalf of the Park Pool resulted in a loss of more than $17.5 million.  Park hid these losses from the pool participants and falsely and fraudulently represented to existing and prospective pool participants that the Park Pool was trading at a profit.  To perpetrate her fraud, Park provided pool participants with false monthly statements with fabricated data.

5.     While Park used portions of the funds collected from the pool participants to trade for the Park Pool, she also misappropriated portions of pool participants' funds.  Over the Relevant Period, Park used pool participants' funds on personal credit card bills, cash withdrawals, and other non-business related expenses not authorized by the pool participants.

Park further misappropriated the funds from pool participants by paying out Park Pool funds to other pool participants, in the manner akin to a Ponzi scheme.

6.      Park, individually and as the agent of Argenta Capital LLC ("Argenta"), a predecessor of Phaetra Management, also made material misrepresentations and omissions regarding her trading expertise, profits, and the track record and performance of the Park Pool to an investment firm based in Louisville, Kentucky ("Investment Firm A"), in order to fraudulently induce Investment Firm A to hire Park and Argenta to manage its funds.  Kaseman recommended Park to Investment Firm A and was aware of Park's and Argenta's engagement by Investment Firm A.

7.      Park and Kaseman made multiple false or misleading statements to the NFA, the self-regulatory organization for the U.S. futures industry, in statutorily required reports filed between January 2014 and the present, and during an April 2016 NFA audit of the Phaetra entities.  Park and Kaseman falsely represented to the NFA that the Phaetra entities had not yet begun to operate or to solicit business.  Park also represented to the NFA that all of the funds in a trading account maintained in her own name at Interactive Brokers were proprietary in nature and comprised solely of her own funds.  However, Park and Kaseman knew that these statements to the NFA were false because they knew that Park, on behalf of the Phaetra entities, had solicited and accepted funds, purportedly for trades, from pool participants during the Relevant Period.

8.      Park and Kaseman also represented to the NFA that neither Argenta Capital GP LLC nor Argenta Capital LLC, predecessors of the Phaetra entities, ever operated or solicited business.  Park and Kaseman knew that statement to the NFA was false because they knew that

Park, on behalf of Argenta Capital LLC, entered into a Commodity Trading Agreement with Investment Firm A and managed a fund for Investment Firm A from March 2013 to May 2014.

9.      By virtue of this conduct, and as more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in acts and practices in violation of provisions of the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and certain of the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2015).

10.     The acts and omissions of Park and Kaseman occurred within the scope of their agency, employment, and/or office with the Phaetra entities; therefore, the Phaetra entities are liable for these acts and omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

11.     Some of Park's acts and omissions also occurred within the scope of her agency, employment, and/or office with Argenta Group; therefore, the Argenta Group is liable for these acts and omissions pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

12.     During the Relevant Period, Park controlled the Phaetra entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of the Phaetra entities described herein; therefore, Park is liable for the acts of the Phaetra entities pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

13.     Similarly, during the Relevant Period, Park controlled Argenta Group, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts of Argenta Group described herein; therefore, Park is liable for the acts of Argenta Group pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

14.     Accordingly, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1 (2012), the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act, as amended, and Commission Regulations.

15.     In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

16.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2012), which authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

18.     Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because the Defendants transacted business in the Southern District of New York, and some of the Defendants' acts and practices in violation of the Act and Regulations occurred within this District.

## III.     THE PARTIES

19.     Plaintiff United States Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with the administration and

enforcement of the Act and the Commission Regulations promulgated thereunder.  The Commission maintains its principal office at 1155 21st Street NW, Washington, DC 20581.

20.     Defendant Haena Park is one of two founders of Phaetra Capital GP LLC, previously operating under the name of Argenta Capital GP LLC, and Phaetra Capital Management LLC, previously operating under the name of Argenta Capital LLC.  Park is also the President and Chairperson of Argenta Group, and sole signatory on its bank account.  Park is the sole person authorized to trade in her personal brokerage account at Interactive Brokers. During the Relevant Period, Park resided in Flanders, New Jersey and New York, New York, and worked in New York, New York.  Park is registered with the Commission as an Associated Person ("AP") of the Phaetra entities but has never been registered in any other capacity with the Commission.

21.     Defendant Yul Kaseman, a/k/a Yul Chung or Yul Chung Kaseman, is one of the two founders and principals of the Phaetra entities.  During the Relevant Period, Kaseman was the Chief Compliance Officer and Chief Operating Officer of the Phaetra entities and responsible for the required periodic public filings and day-to-day operations of the two entities.  Kaseman resided and worked in New York, New York.  Kaseman is registered with the Commission as an AP of the Phaetra entities but has never been registered in any other capacity with the Commission.

22.     Defendant Phaetra Capital GP LLC is a Delaware limited liability company with its principal place of business listed as New York, New York.  Phaetra GP was incorporated as Argenta Capital GP LLC in 2010 and renamed Phaetra Capital GP LLC on or about September 2013.  Park and Kaseman are the principals and sole employees of Phaetra GP and Phaetra Management, and control Phaetra GP's and Phaetra Management's operations, finances,

accounts, and books and records.  Park is the Chief Investment Officer and Managing Partner of

the Phaetra entities, and the founder and President of Argenta Group LLC.  Park and Kaseman

initially attempted to register Argenta Capital GP LLC with the Commission as a Commodity

Pool Operator ("CPO") on March 26, 2013.  In September, 2013, while Argenta Capital GP

LLC's CPO application was pending, Park and Kaseman withdrew the application and

subsequently resubmitted an application to register Phaetra GP as a CPO, and Phaetra GP was so

registered from January 2014 through the present.  Phaetra GP has never been registered as a

Commodity Trading Advisor ("CTA") with the Commission.

23.     Defendant Phaetra Capital Management LLC is a Delaware limited liability

company with its principal place of business listed as New York, New York.  Phaetra

Management was incorporated as Argenta Capital LLC in 2010 and renamed Phaetra Capital

LLC on or about September 24, 2013.  Park and Kaseman initially attempted to register Argenta

Capital LLC as a CPO on March 26, 2013.  In September, 2013, while Argenta Capital LLC's

CPO application was pending, Park and Kaseman withdrew the application and resubmitted an

application under Phaetra Management's name.  Phaetra Management has been registered with

the NFA as a CPO from December 2013 through the present.   Phaetra Management has never

been registered as a CTA with the Commission.

24.     Defendant Argenta Group LLC is a New York limited liability company with its

principal place of business listed as New York, New York.  Argenta Group was incorporated in

2010.  Haena Park is listed as the president and chairperson of Argenta Group.  Argenta Group

has never been registered as a CPO or CTA with the Commission.

## IV.     OTHER RELEVANT ENTITIES

25.     The National Futures Association is a futures association registered with the

Commission pursuant to Section 17 of the Act, 7 U.S.C. § 21 (2012).  Membership in the NFA is

mandatory for all persons and entities conducting business with the public in the U.S. futures industry, including CPOs and APs of CPOs.  Pursuant to its official duties as a registered futures association, the NFA has developed a body of rules to safeguard market integrity, protect investors from fraud, and help futures entities and their APs meet regulatory responsibilities. NFA members are subject to audits and investigations by the NFA to ensure compliance with NFA rules, the Act, and Commission Regulations.  Cooperation and candor by NFA members with NFA compliance and audit staff are critical to the NFA's ability to discharge its obligations as a registered futures association to, among other things, protect members of the public from persons or entities unlawfully soliciting customers, accepting customer orders, or exercising trading discretion on behalf of customers.

V.      FACTS

A.      Operation of the Park Pool

26.      Park first opened a personal trading account at Interactive Brokers ("IB Trading Account") in November 2008.  Beginning in January 2010, Park began soliciting funds from prospective pool participants and induced pool participants to transfer funds via wire into bank accounts in her own name and in the name of Argenta Group LLC.  By May 31, 2016, approximately 50 pool participants had transferred more than $23 million to bank accounts controlled by Park.  Park had transferred approximately $21.5 million to the IB Trading Account, and misappropriated the remainder of the funds.

27.      During the Relevant Period, the Park Pool consistently suffered heavy losses through Park's trading.  The pool declined in value in 74 out of the 91 months it had operated, and suffered a cumulative loss of approximately $19.4 million, or 99% of the value of the pool. On May 31, 2016, the total value of the Park Pool had declined to approximately $196,000.

28.     At Park's instruction, pool participants wired funds directly to personal bank accounts held in Park's name at Bank of America, J.P. Morgan and Citibank (collectively, "Park Personal Bank Accounts"), as well as an account at Citibank held in the name of Argenta Group LLC controlled by Park ("Argenta Bank Account").   Park transferred approximately $19 million of the $23 million wired by the pool participants into the IB Trading Account.   She misappropriated the rest of the funds, or approximately $4 million.   The funds transferred to the IB Trading Account were used to effect futures and forex transactions.   Park also withdrew a total of approximately $1.8 million.

29.     At all relevant times, Park was the sole signatory on the Park Personal Bank Accounts and the Argenta Bank Account.   She was also the sole person authorized to trade in the IB Trading Account.   Accordingly, at all relevant times Park had personal knowledge of the total amount of funds accepted by the pool from participants, the disposition of those funds, as well as the number of trades effected on behalf of pool participants in the Park Pool and the date each trade was made.   As reflected in the daily activity statements for the IB Trading Account, Park actively traded commodity futures and forex each month throughout the Relevant Period.

> B.     <u>Material Misrepresentations to Pool Participants</u>

30.     During the Relevant Period, Park made material misrepresentations and omissions regarding her trading expertise, profits, and the track record and performance of the Park Pool when soliciting funds from prospective pool participants.   Park knowingly made misrepresentations and omissions in order to fraudulently induce prospective pool participants to deposit, maintain, or increase their deposits in the Park Pool.

31.     Park represented to prospective pool participants that they were investing in a pooled "friends and family" fund run by the Phaetra entities or its predecessors, rather than an

commodity pool run out of the IB Trading Account.  When Park made solicitations from prospective pool participants, she furnished them with charts purporting to contain actual performance data over the preceding months.  In truth, the charts contained fabricated data that bore no relationship or resemblance to reality.  At all relevant times, the Park Pool suffered heavy losses and declined steeply in value due to Park's trading.  Park never disclosed these losses to the prospective and existing pool participants.

32.     For example, in April 2015, Park solicited funds from a prospective pool participant J.A., who resided in Baltimore, Maryland.  During this solicitation, Park knowingly made false and fraudulent representations about the performance and track records of the Park Pool.

33.     On or about April 2, 2015, Park emailed J.A. a document titled "Returns.pdf", which Park represented showed the actual performance of an investment of $1,000,000 made in November 2009 under her management.  The document falsely represented that, under Park's management, the initial investment of $1,000,000 achieved a cumulative return of 393.2% and grew to $4,778,229 by February 27, 2015.  The chart also falsely showed that, in the 64-month period between November 2009 and February 2015, the purported investment suffered a loss in value in only four of the 64 months, and experienced growth between 0.2 % to 8.4% per month in 60 of the 64 months.

34.     In truth, contrary to Park's representations, between November 2009 and February 2015, the Park Pool had lost approximately $10.13 million as a result of Park's trading activities, and suffered losses in value in 48 out of the 64 preceding months.  In August 2011, where Park claimed to have enjoyed the highest monthly gain of 8.4% in the value of her investments, her trading actually resulted in a *loss* of $256,686 to the Park Pool, or a loss of over

88% of the total value of the pool for that month. Park knew or should have known that these representations regarding the track record and performance of the Park Pool were false because she was the sole person in control of and responsible for the IB Trading Account and the Park Pool at all relevant times. Park made these misrepresentations in order to fraudulently induce J.A. to invest in the Park Pool.

35.     On or about April 1, 2015, Park induced J.A. to execute an "Agreement of Investment". The parties to the "Agreement of Investment" were J.A. and Park, as agent of Phaetra Capital Management LP, which Park represented to be the successor-in-interest to Argenta Capital LLC. The "Agreement of Investment" provided that J.A. would make an initial investment of $700,000. The "Agreement of Investment" further falsely and fraudulently represented the following:

a).  Park's and Phaetra Management's fees would be limited to an annual fee of 2% of the principal, to be applied at the beginning of each fiscal year, and 10% of the annual performance, to be applied at the end of each fiscal year;

b).  J.A.'s investment would be tracked by Park, and Park would send to J.A. a monthly statement showing monthly and year-to-date gains and losses on the principal invested; and

c).  Upon a notification of withdrawal by J.A., positions would be liquidated from the brokerage account by the end of the month and the resulting capital would be sent to J.A.

36.     Based on Park's fraudulent representations, J.A. made an initial investment of $700,000 and transferred the funds to Park via wire on or about April 2, 2015. Subsequently, between May 15, 2015 and September 18, 2015, J.A. made three additional investments totaling

$3.3 million.  Each time J.A. re-invested, he and Park executed a new Agreement of Investment containing similar, and similarly fraudulent, language.  Park transferred a portion of J.A.'s investment funds to the IB Trading Account and misappropriated the rest.

37.     As another example, on or about January 4, 2016, Park solicited funds from a prospective pool participant A.D., who resided in London, United Kingdom, to participate in the Park Pool.  During this solicitation, Park made false and fraudulent representations about the performance and track record of the Park Pool.

38.     On or about January 6, 2016, Park and A.D. spoke on the phone regarding the possibility of investing in the Park Pool.  After the call, Park emailed A.D. a document titled "Returns.pdf".  In her email to A.D., Park referred to the "Returns.pdf" document as "performance data" and asked A.D. to keep the data confidential.  The "Returns.pdf" document, similar to the document received by J.A. described above, consisted of a chart purporting to show the actual performance of an investment of $1,000,000 made in November 2009.  The document falsely represented that, under Park's management, an initial investment of $1,000,000 in November 2009 obtained a cumulative return of 514.2% and grew to $6,142,448 by December 31, 2015.  The chart also purported to show that, in the 74-month period between November 2009 and December 2015, the investment suffered a loss in value in only four of the 74 months, and experienced monthly growth between 0.2 % to 8.4% in 70 of the 64 months.

39.     In truth, and contrary to Park's representations, by December 2015, the Park Pool had lost over $16.34 million as a result of Park's trading activities.   In the 74-month period between January 2009 and December 2015, the Park Pool lost value in 60 out of 74 months.  Park knew or should have known that her representations regarding the track record and performance of the Park Pool were false because she was the sole person in control of and

responsible for the IB Trading Account and the Park Pool at all relevant times.  Park made these misrepresentations in order to fraudulently induce A.D. to invest in the Park Pool.

40.     Based on Park's fraudulent representations and omissions, A.D. decided to invest in the Park Pool and transferred $800,000 to Park via wire on or about January 11 and 13, 2016.  A.D. also introduced his parents, R.D. and L.D., who resided in Edison, New Jersey, to Park.  In January and April 2016, R.D. and L.D. made two investments totaling $850,000 in the Park Pool.  Park transferred a portion of these investment funds to the IB Trading Account and misappropriated the rest.

41.     During the Relevant Period, Park, individually and as agent of the Phaetra entities, both orally and in writing, falsely represented to pool participants that their share of the Park Pool had increased in value due to successfully trading, when in fact the value of the Park Pool had suffered heavy trading losses.  During the Relevant Period, Park failed to disclose that the Park Pool had only 17 winning months out of 91 months, and suffered a cumulative loss of nearly $19.4 million.  On May 31, 2016, the total value of the Park Pool had declined to approximately $196,000.

42.     Park hid these losses from pool participants. Park knowingly misrepresented to pool participants on multiple occasions that their total principal investment was intact and that trading was profitable, when Park knew this was not true.  Park knowingly issued false account statements to pool participants reporting profitable earnings in the pool, when she knew that there were no such profitable earnings, and that there was instead an overall significant decrease in the net value of the pool due to the combined effect of trading losses, Park's misappropriation, and payments to some pool participants in the manner akin to a Ponzi scheme. In addition, Park omitted to tell prospective and existing pool participants (a) that she was presently losing money

trading commodities and futures and had consistently lost money trading commodities and futures in the past; (b) that she traded only a portion of pool participant funds and misappropriated the remainder.

43.     For example, from April 2015 to the present, Park provided J.A. with false and fraudulent monthly statements, which contained fictitious data on the performance of J.A.'s investments.  These monthly statements falsely state that the value of J.A.'s investment increased to $5,103,622 by April 29, 2015, or a cumulative return of 35.7% in value.  According to these false statements, J.A.'s investment had increased in value in each of the twelve months, with a monthly return ranging from 0.9% to 4.7%.  In truth, during the same period, the Park Pool had lost value in each of the preceding twelve months and suffered a cumulative loss of approximately $7 million.

44.     Based on Park's misrepresentations and omissions of the value and performance of J.A.'s investments, J.A. made additional deposits in the Park Pool after his initial investment and continued to maintain his investment with the Park Pool.

45.     Similarly, from January 2016 to the present, Park sent to A.D. via email four false and fraudulent monthly statements that contained fictitious data on the performance of A.D.'s investments.  These monthly statements falsely stated that the value of A.D.'s $800,000 investment had increased to $863,397 by April 29, 2015, which was a cumulative return rate of 8.8% in value.  On or about April 4, 2016, Park stated in an email to A.D. that "[w]e had a very good month".  As recently as May 5, 2016, Park stated in an email to A.D that "[w]e had a good month".  In truth, during the same period, the Park Pool lost value every month and suffered a cumulative loss of approximately $2 million and Park failed to disclose these facts.

46.     Based on Park's misrepresentations and omissions regarding the value and performance of A.D.'s investments, A.D. continued to maintain his investment with the Park Pool.

                C.        <u>Pool Defendants Made Material Misrepresentations to Investment Firm A</u>

47.     Park, individually and as the agent of Argenta Capital LLC ("Argenta"), also made material misrepresentations and omissions regarding her trading expertise, profits, and the track record and performance of the Park Pool to employees and officers of "Investment Firm A", an investment firm based in Louisville, Kentucky.   Park knowingly made misrepresentations in order to fraudulently induce Investment Firm A to hire herself and Argenta to manage Investment Firm A's funds as a CTA.

48.     In December 2012, Kaseman introduced and recommended Park to J.F., then an employee at Investment Firm A.  On or about December 11, 2012, on an introductory call with J.F., Park falsely and fraudulently represented that she had been managing about $5 million of her own money at the time, that her own investments had a "30-35% annualized return" since 2010, and that her biggest monthly "drawdown", or a decline in the value of her investment, had been only 2.5%.

49.     J.F. subsequently visited Park's apartment in New York on or about January 10, 2013, and further discussed Park's credentials, track record, and trading strategy.  At this meeting, Park falsely and fraudulently represented that she was currently trading $4.5 million of personal funds and "friends and family" money in commodity futures and forex accounts.  Park also falsely represented that she had begun investing with $1 million of her own money in 2009, and had grown her initial investment to $3 million by January 2013.

50.     In truth, and contrary to Park's misrepresentations, at the beginning of December 2012, the value of the positions in Park's IB Trading Account totaled only approximately $868,852.  By the end of December 2012, due to trading losses, the value in the IB Trading Account further declined to $253,478 despite a deposit of $149,000 that month, and to $164,488 by the end of January 2013.  Moreover, by month-end January 2013, rather than enjoying a 30-35% annualized return, Park had instead suffered cumulative losses of approximately $4.96 million in value from the approximately $5.13 million in net deposits in the IB trading account. Park failed to disclose these facts.  Park knew that her representations regarding the track record and performance of her own trading and investments were false because she was the sole person in control of and responsible for the IB Trading Account and the Park Pool.  Park made these misrepresentations in order to fraudulently induce Investment Firm A to hire her and Argenta to manage Investment Firm A's funds.

51.     As a result of Park's misrepresentations and omissions, on or about February 22, 2013, Investment Firm A entered into a Trading Advisor Agreement with Park, as the agent and manager of Argenta, to manage a fund ("Master Fund") for the firm.  Subsequently, Investment Firm A granted to Park and Argenta the authority to trade $5 million on behalf the Master Fund. That trading authority was increased to $15 million by the end of 2013.  Park, as the agent and manager of Argenta, managed a trading account held at the FCM Newedge USA, LLC on behalf of the Master Fund ("Newedge Account") from March 2013 until June 2014 and traded commodity futures and forex.  Throughout this time, Park was the sole person authorized to trade in the Newedge Account for the benefit of the Master Fund.

52.     During the course of Park's management, the Master Fund suffered trading losses of more than $1.9 million.  Due to poor performance, Investment Firm A terminated its

relationship with Park on or about May 27, 2014.  At the time of her departure, Park had been

paid a total of approximately $146,238 in management and performance fees.

> ### D.   False Statements to the NFA

53.     In furtherance of its official duties under the Act, the NFA conducts periodic

audits and examinations of NFA members as a means of monitoring and assuring compliance

with NFA rules, the Act, and Commission Regulations.  In addition, pursuant to NFA rules, the

Act, and Commission Regulations, CPOs are required to file with the NFA quarterly financial

reports for each pool the CPO operates.

54.     Park and Kaseman, individually and as the agents of the registered Phaetra

entities, made multiple false or misleading statements to the NFA in statutorily required reports

filed between January 2014 and the present, and during an April 2016 NFA audit of the

registered Phaetra entities.

55.     Between May 20, 2014 and the present, Phaetra GP and Phaetra Management, by

and through its agents Park and Kaseman, filed at least 18 false written reports with the NFA.

Despite that between January 1, 2014 and the present (the "reporting period"), Park solicited and

received funds from pool participants on behalf of the Phaetra entities, Phaetra GP and Phaetra

Management, by and through its agent Park, falsely represented to the NFA that although

registered as CPOs, Phaetra GP and Phaetra Management had not in fact been operating as CPOs

or CTAs during the reporting period.  Kaseman, as Phaetra GP's and Phaetra Management's

Chief Compliance Officer and Chief Operating Officer, filed the majority of these false reports

with the NFA.  Kaseman, who was also responsible for marketing, investor relations, and

internal operational details at Phaetra Management, and Park, knew these statements were false

because they knew or should have known that Park solicited funds from pool participants as the

agent of the Phaetra entitiesduring the reporting period, and used these funds to traded forex and commodity futures contracts.  Park and Kaseman also knew that Phaetra Management, and its predecessor Argenta, acted as a Commodity Trading Advisor ("CTA") for the Master Fund.

56.     On March 31, 2016, after the filing of the false quarterly reports, the NFA contacted the Phaetra entities to announce a routine, on-site examination on the activities of the firms to ensure the firms were in compliance with their recordkeeping and financial requirements.  Kaseman answered the call from NFA and represented to the NFA that Phaetra GP and Phaetra Management had not conducted business in any capacity to date.  Kaseman further represented that Park actively traded her personal IB Trading Account at home.

57.     On April 1, 2016, Kaseman telephoned the NFA and represented once again that there was little to no activity in bank and broker accounts established for the Phaetra entities.

58.     On April 4, 2016, NFA conducted an on-site examination of the Phaetra entities. During the examination, Park and Kaseman both represented that:

a)      neither of the Phaetra entities had commenced business of any kind;

b)      neither the Phaetra entities nor Park or Kaseman currently managed any third-party accounts; and

c)      neither Argenta Capital GP LLC nor Argenta Capital LLC ever operated or solicited business.

59.     Pursuant to a NFA document request issued prior to the on-site visit, Phaetra GP and Phaetra Management, by and through Park and Kaseman, represented to the NFA on the same day of the on-site visit that the only proprietary or non-customer account maintained was Park's IB Trading Account.  During the onsite meeting, Phaetra GP and Phaetra Management

both furnished the NFA with letters stating that they were not doing any business to date.  The letters state: "As of this date, we have not conducted any futures or forex business."

60.     Subsequent to the on-site examination and pursuant to a NFA request, Park provided the NFA with statements to the IB Trading Account for the period October 1, 2015 through March 31, 2016 via email in the evening of April 4, 2016.  In the same email exchange, Park provided written representation that the activity in the IB Trading Account was proprietary in nature and comprised solely of her personal funds.

61.     Park and Kaseman knew these statements were false because they knew that Park had solicited funds from pool participants on behalf of the Phaetra entities, and that Park had been actively traded commodity futures contracts in the IB Trading Account throughout the reporting period.  Further, Park and Kaseman knew that that Park, on behalf of Argenta, entered into a Commodity Trading Agreement with Investment Firm A and managed the Master Fund from March 2013 to May 2014.

<u>STATUTORY AND REGULATORY VIOLATIONS</u>

<u>COUNT ONE</u>

FRAUD IN CONNECTION WITH COMMODITY FUTURES CONTRACTS
Violations of Sections 4b(a)(1)(A)-(C) of the Act

62.     The allegations set forth in the foregoing paragraphs are re-alleged and

incorporated herein by reference.

63.     Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012), provide,

in relevant part, that it is unlawful "for any person, in or in connection with any order to make, or

the making of, any contract of sale of any commodity in interstate commerce or for future

delivery that is made, or to be made, on or subject to the rules of a designated contract market,

for or on behalf of any other person . . . (A) to cheat or defraud or attempt to cheat or defraud the

other person; (B) willfully to make or cause to be made to the other person any false report or

statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in

regard to any order or contract or the disposition or execution of any order or contract, or in

regard to any act of agency performed, with respect to any order or contract for or, in the case of

paragraph (2), with the other person."

64.     During the Relevant Period, Pool Defendants cheated or defrauded or attempted

to cheat or defraud other persons; issued or caused to be issued false statements; and willfully

deceived or attempted to deceive other persons in connection with the offering of, or entering

into futures contracts and the margined or leveraged forex transactions alleged herein, by

fraudulently soliciting prospective and existing pool participants by making material

misrepresentations and omissions, including but not limited to the following:

a)  Making false and fraudulent statements in the solicitation of prospective and
actual pool participants, including sending the documents "Returns 2009-
2012.pdf," "Returns.pdf," and "Agreements for Investments" as set forth above;

b)  misrepresenting the profitability of the Park Pool and failure to disclose the heavy
losses by the Park Pool;

c)  misappropriating pool participant funds to pay our redemption or to pay for Park's
personal expenses;

d)  distributing false account statements and written and oral reports to pool
participants; and

e)  making fraudulent written and oral promises to redeem pool participants' funds,
that misrepresented the value of customers' accounts and customers' holdings;

f) Failing to disclose to prospective and existing pool participants (i) that Park was
losing money trading commodities and futures and had consistently lost money
trading commodities and futures in the past; (ii) that Park traded only a portion of
pool participant funds and misappropriated the remainder.  Like Park's
misrepresentations, each of these material deceptive omissions violates Section
4b(a) of the Act.

all in violation of Sections 4b(a)(1)(A)-(C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-
(C) (2012).

65.   Pool Defendants engaged in the acts and practices described above knowingly,
willfully or with reckless disregard for the truth.

66.   Park, directly or indirectly, controlled the Phaetra entities and Argenta Group, and
did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the

Phaetra entities' and Argenta Group's violations alleged in this count.  Park is thereby liable for the Phaetra entities' and Argenta Group's violations of the Act and Regulations, as alleged in this count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

67.     The foregoing acts of fraudulent solicitation, misappropriation, omission and false statements by Park occurred within the scope of her employment, office or agency with the Phaetra entities and Argenta Group.  Therefore, the Phaetra entities and Argenta Group are liable for Park's violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

68.     Each act of fraudulent solicitation, misappropriation and false statement or report, including but not limited to those specifically alleged herein, is alleged as separate and distinct violations of Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012).

<u>COUNT TWO</u>

FRAUD IN CONNECTION WITH FOREX CONTRACTS
Violations of Sections 4b(a)(2)(A)-(C) of the Act

69.     The allegations set forth in the foregoing paragraphs are re-alleged and incorporated herein by reference.

70.     For conduct before July 16, 2011, Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2) (A)-(C) (Supp. III 2009), made it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false

record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person."

71.     For conduct on or after July 16, 2011, Sections 4b(a)(2)(A)-(C) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012), make it unlawful "for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person."  Sections 4b(a)(2)(A)-(C) of the Act apply to the forex transactions, agreements or contracts offered by defendants as if they were futures contracts.  Section 2(c)(2)(C)(iv) of the Act, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv)(2012).

72.     During the relevant period, Pool Defendants cheated or defrauded or attempted to cheat or defraud other persons; issued or caused to be issued false statements; and willfully deceived or attempted to deceive other persons in connection with offering of, or entering into futures contracts and the margined or leveraged forex transactions alleged herein, by fraudulently soliciting prospective and existing pool participants by making material misrepresentations and

omissions, including but not limited to the fraudulent conduct described in Count One of this Complaint, as set forth above, and all in violation of Sections 4b(a)(2)(A)-(C) of the Act, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012).

73.     Pool Defendants engaged in the acts and practices described above knowingly, willfully or with reckless disregard for the truth.

74.     Park, directly or indirectly, controlled the Phaetra entities and Argenta Group, and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the Phaetra entities' and Argenta Group's violations alleged in this count.  Park is thereby liable for the Phaetra entities' and Argenta Group's violations of the Act and Regulations, as alleged in this count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

75.     The foregoing acts of fraudulent solicitation, misappropriation and false statements by Park occurred within the scope of their employment, office or agency with the Phaetra entities.  Therefore, the Phaetra entities and Argenta Group are liable for Park's violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

76.     Each act of fraudulent solicitation, misappropriation and false statement or report, including but not limited to those specifically alleged herein, is alleged as separate and distinct violations of Sections 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012).

COUNT THREE

FRAUD BY A COMMODITY POOL OPERATOR
Violations of Section 4o(1)(A) and (B) of the Act

77.     The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

78. Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits CPOs and associated persons of CPOs from using the mails or any other means or instrumentality of interstate commerce to (A) employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or (B) engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

79. As set forth above, during the Relevant Period, the Phaetra entities and Argenta Group, through Park, acted as a CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in futures contracts. Park acted as an associated person of a CPO because she was a partner, officer, employee, consultant or agent of a CPO in a capacity that involved the solicitation of funds, securities or property for participation in a commodity pool.

80. The Phaetra entities and Argenta Group, through Park, and Park, violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2012), in that they employed or are employing a device, scheme or artifice to defraud actual and prospective pool participants or engaged or is engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon the pool participants or prospective pool participants. The fraudulent acts include, inter alia, those described in Counts One and Two of this Complaint, as set forth above.

81. The foregoing acts of fraudulent solicitation, misappropriation and false statements by Park occurred within the scope of her employment, office or agency with the Phaetra entities. Therefore, the Phaetra entities are liable for Park's violations of the Act and

Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §

2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

82.     Park, directly or indirectly, controlled the Phaetra entities and Argenta Group and

did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the

Phaetra entities' and Argenta Group's violations alleged in this count.  Park is thereby liable for

the Phaetra entities' and Argenta Group's violations of the Act and Regulations, as alleged in this

count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

83.     Each act of fraudulent solicitation, misappropriation and false statement or report,

including but not limited to those specifically alleged herein, is alleged as a separate and distinct

violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012).

COUNT FOUR

FRAUD BY A COMMODITY TRADING ADVISOR<br>Violations of Section 4o(1)(A) and (B) of the Act

84.     The allegations set forth in preceding paragraphs are re-alleged and incorporated

herein by reference.

85.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits CTAs and associated

persons of CTAs from using the mails or any other means or instrumentality of interstate

commerce to (A) employ any device, scheme or artifice to defraud any client or participant or

prospective client or participant; or (B) engage in any transaction, practice or course of business

which operates as a fraud or deceit upon any client or participant or prospective participant.

86.     As set forth above, during the Relevant Period, Phaetra Management, previously

doing business as Argenta, through Park, acted as a CTA by, among other things, engaging in the

business of advising Investment Firm A as to the value of or the advisability of trading in

commodity futures contracts and forex for compensation or profit.  Park acted as an associated

- 26 -

person of a CTA because she was a partner, officer, employee, consultant or agent of a CTA in a capacity that involved soliciting client's or prospective client's discretionary accounts.

87.     Phaetra Management, through Park, and Park, violated Section 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2012), in that they employed a device, scheme or artifice to defraud Investment Firm A or engaged or is engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon Investment Firm A.

88.     Park, directly or indirectly, controlled Phaetra Management and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting Phaetra Management's violations alleged in this count.  Park isthereby liable for Phaetra Management's violations of the Act and Regulations, as alleged in this count, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

89.     The foregoing acts of fraudulent solicitation, misappropriation and false statements by Park occurred within the scope of her employment, office or agency with Phaetra Management.  Therefore, Phaetra Management is liable for Park's violations of the Act and Regulations, as alleged in this count, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2015).

90.     Each act of fraudulent solicitation, misappropriation and false statement or report, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012).

## COUNT FIVE

### FAILURE TO REGISTER AS A CPO AND A CTA
### Violation of Section 4m(1) of the Act

91.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

92.     During the Relevant Period, the Phaetra entities and Argenta Group, through Park, engaged in a business that was of the nature of an investment trust, syndicate, or similar form of enterprise, and in connection therewith, solicited, accepted, or received from others, funds, securities, or property, either directly or indirectly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading a commodity for future delivery on or subject to the rules of a contract market or derivatives transaction execution facility, or property for a pooled investment vehicle that was engaged in forex transactions, thus making it a commodity pool operator as defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11).

93.     During the Relevant Period, the Phaetra entities and Argenta Group, through Park, acted as a CPO because they solicited funds, securities, or property for a pooled investment vehicle that was not an eligible contract participant and engaged in forex transactions.

94.     During the Relevant Period, the Phaetra entities and Argenta Group were not exempt from registering as a CPO.

95.     During the Relevant Period, Phaetra Management, through Park, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, security futures product, or swap for compensation or profit, or property for a pooled investment vehicle that was engaged in forex transactions, thus making it a commodity trading advisor as defined by Section 1a(12) of the Act, 7 U.S.C.§ 1a(12).

96.     During the Relevant Period, Phaetra Management was not exempt from registering as a CTA.

97.     During the Relevant Period, the Phaetra entities and Argenta Group, through Park, made use of the mails or any means of interstate commerce in connection with its business as a

CPO and CTA, while failing to register, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012).

98.     Park controlled the Phaetra entities and Argenta Group directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the Phaetra entities' and Argenta Group's acts constituting the violations alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Park is liable for the Phaetra entities' and Argenta Group's violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2012) .

<u>COUNT SIX</u>

FAILURE TO OPERATE COMMODITY POOL AS A SEPARATE LEGAL ENTITY,
IMPROPER ACCEPTANCE OF FUNDS, AND COMMINGLING OF POOL FUNDS
Violations of Commission Regulation 4.20 (a)-(c), 17 C.F.R. §4.20(a)-(c) (2015)

99.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

100.    Commission Regulation 4.20(a), 17 C.F.R. § 4.20(a) (2015), requires a CPO to operate its commodity pool as a legal entity separate from that of the CPO.

101.    Commission Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2015), requires that all funds, securities, or other property received by a CPO from a prospective or existing pool participant must be received in the commodity pool's name.

102.    Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2015), prohibits a CPO from commingling the property of any pool it operates with the property of any other person.

103.    During the Relevant Period, the Phaetra entities and Argenta Group, through Park, violated Commission Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c) (2015), by:  (i) failing to operate the commodity pool as a legal entity separate from Park's personal IB Trading Account; (ii) receiving pool participant funds in Park's own name, rather than in the name of the Park

Pool; and (iii) commingling the property of the Park Pool with Park's personal funds in bank

accounts held in her own name.

104.    Each instance of improper receipt and commingling of pool participant funds,

including but not limited those specifically alleged herein, is alleged as a separate and distinct

violation of Commission Regulation 4.20(a)-(c), 17 C.P.R. § 4.20(a)-(c) (2015).

<u>COUNT SEVEN</u>

FALSE STATEMENTS TO THE NFA
Violation of Section 9(a)(4) of the Act

105.    The allegations in the foregoing paragraphs are re-alleged and incorporated herein

by reference.

106.    Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012), makes it unlawful for:

> Any person willfully to falsify, conceal, or cover up by any trick,
> scheme, or artifice a material fact, make any false, fictitious, or
> fraudulent statements or representations, or make or use any false
> writing or document knowing the same to contain any false,
> fictitious, or fraudulent statement or entry to a registered entity,
> board of trade, swap data repository, or futures association
> designated or registered under this Act acting in furtherance of its
> official duties under this Act.

107.    Park and Kaseman, individually and as the agents of the Phaetra entities, willfully

made materially false statements to the NFA, and concealed material information from the NFA,

in statutorily required reports and during oral communications with NFA staff during an NFA

audit in furtherance of the NFA's official duties under the Act, in violation of Section 9(a)(4) of

the Act, 7 U.S.C. § 13(a)(4) (2012).

108.    Specifically, as alleged above, Park and Kaseman, individually and as the agents

of  the Phaetra entities, falsely stated to NFA staff during an NFA audit and in statutorily

required reports filed with the NFA that the Phaetra entities commodity pool did not operate

during calendar years 2015 and 2016, and has never operated or solicited investor funds.

109.     Park and Kaseman knew that these material statements were false as Park personally accepted funds from pool participants on behalf of the Phaetra entities and ACL, and Park actively traded commodity futures contracts in the IB Trading Account on behalf of pool participants during the Relevant Period, including in 2015 and 2016.

110.     By making false statements to the NFA, and by concealing trading activity from the NFA, Park and Kaseman, individually and as the agent of the Phaetra entities, willfully falsified, concealed, and covered up by trick, scheme, or artifice material facts and made false writings or documents knowing the same to contain false statements, in violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012).

111.     Each of the false statements Park and Kaseman made to the NFA occurred within the scope of their office or employment with the Phaetra entities.  Therefore, the Phaetra entities are liable for those false statements pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2015).

112.     Moreover, at all times pertinent to this Complaint, Park controlled the Phaetra entities, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the Phaetra entities' violations of Section 9(a)(4) of the Act. Therefore, Park is liable for the Phaetra entities' violations of Section 9(a)(4) of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012).

113.     Each false, fictitious, or fraudulent statement, representation, or omission, and each act of concealment, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012).

### E.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers, enter:

a)      An order finding that Pool Defendants violated Sections 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C); 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. §§ 6b(a)(1) & (2)(A)-(C) (Supp. III 2009), with respect to conduct before July 16, 2011; 4b(a)(2)(A)-(C) of the Act, as amended, 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012), with respect to conduct on or after July 16, 2011; Sections 4o(1)(A) & (B) and 4m(1) of the Act, 7 U.S.C. §§ 6o(1)(A) & (B) and 6m(1)(2012), with respect to conduct during the Relevant Period; and, Commission Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c) (2015) with respect to conduct during the Relevant Period;

b)      An order finding that Defendants violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4) (2012) with respect to conduct during the Relevant Period.

c)      An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, holding companies, alter egos, and persons in active concert or participation with defendants, including any of their successors, from, directly or indirectly:

(i)      engaging in conduct in violation of Sections 4b(a)(1)(A)-(C), 4b(a)(2)(A)-(C), 4o(1)(A) & (B), 4m(1), and 9(a)(4) of the Act, as amended, to be codified at 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), 6o(1)(A) & (B), 6m(1), and 13(a)(4), and Commission Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c) (2015);

(ii)      trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, as amended, to be codified at 7 U.S.C. § la);

(iii)      entering into any transactions involving "commodity interests" (as that term is defined in regulation 1.3(yy), 17 C.F.R. § 1.3(yy)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

(iv)      having any commodity interests traded on any Defendants' behalf;

(v)      controlling or directing the trading for or on behalf of any other person or

entity, whether by power of attorney or otherwise, in any account involving commodity

interests;

(vi)     Soliciting, receiving, or accepting any funds from any person for the

purpose of purchasing or selling any commodity interests;

(vii)    applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such registration or

exemption from registration with the Commission, except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015);

(viii)    acting as a principal (as that term is defined in Regulation 3.1(a), 17

C.F.R. § 3.1(a) (2015)), agent or any other officer or employee of any person registered,

exempted from registration or required to be registered with the Commission except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2015);

d)     An order directing Pool Defendants, as well as any of their successors, holding

companies and alter egos, to disgorge, pursuant to such procedure as the Court may order, all

benefits received from the acts or practices which constitute violations of the Act and the

Regulations, as described herein, and pre- and post-judgment interest thereon from the date of

such violations;

e)     An order directing Pool Defendants to make full restitution to every person or entity

whose funds they received or caused another person or entity to receive as a result of acts and

practices that constituted violations of the Act and the Regulations, as described herein, and pre-

and post-judgment interest thereon from the date of such violations;

f)     An order directing Defendants to pay a civil monetary penalty for each violation of

the Act and the Regulations described herein, plus post-judgment interest, in the amount of the

higher of: 1) $140,000 for each violation of the Act and Regulations committed on or after

October 23, 2008; or 2) triple the monetary gain to defendants for each violation of the Act and

the Regulations, plus post-judgment interest;

g)      An order directing Pool Defendants and any of their successors, holding companies

and alter egos, to rescind, pursuant to such procedures as the Court may order, all contracts and

agreements, whether implied or express, entered into between them and any of the pool

participants and pool participants whose funds were received by them as a result of the acts and

practices which constituted violations of the Act and the Regulations, as described herein;

h)      An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2)(2012); and

i)      Such other and further relief as the Court deems proper.


Dated: June 2, 2016                   Respectfully submitted,


                                      U.S. COMMODITY FUTURES TRADING COMMISSION

                                      _____/s Michael R. Berlowitz_____
                                      Michael R. Berlowitz
                                      U.S. Commodity Futures Trading Commission
                                      140 Broadway, 19th Floor
                                      New York, NY 10005
                                      p: (646) 746-9743
                                      f: (646) 746-9939
                                      mberlowitz@cftc.gov

                                      Greta G. Gao (*pro hac vice* admission pending)
                                      Luke B. Marsh (*pro hac vice* admission pending)
                                      Paul G. Hayeck (pro hac vice admission pending)
                                      U.S. Commodity Futures Trading Commission
                                      Division of Enforcement
                                      1155 21st Street, N.W.

Washington D.C. 20581
p: (202) 418-5000
f: (202)418-5523
ggao@cftc.gov
lmarsh@cftc.gov
phayeck@cftc.gov