UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
: 
U.S. COMMODITY FUTURES :
TRADING COMMISSION, :
: 16-CV-4120 (VEC)
Plaintiff, :
: PLAINTIFF'S REPLY BRIEF
-against- : IN SUPPORT OF MOTION FOR
: SUPPLEMENTAL ORDER OF
HAENA PARK, YUL KASEMAN, : STATUTORY AND EQUITABLE RELIEF
PHAETRA CAPITAL GP LLC a/k/a : AGAINST HAENA PARK, PHAETRA
ARGENTA CAPITAL GP LLC, : CAPITAL GP LLC, PHAETRA CAPITAL
PHAETRA CAPITAL MANAGEMENT : MANAGEMENT LP, AND ARGENTA
LP a/k/a ARGENTA CAPITAL LLC, and : GROUP LLC
ARGENTA GROUP LLC, :
:
Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Ultimately, this case is about fair punishment for a $23 million Ponzi scheme. The undisputed facts are as follows: Defendant Haena Park defrauded, over six years, more than $23 million from over 50 investors, many of whom were her closest friends and family members. She misappropriated $1.74 million for her personal expenses, paid out a small portion of the funds in order to maintain the illusion of profitable trading, and lost the rest of the funds—approximately $19.26 million—through continuous reckless trading. All the while, Park hid these losses from investors and continually solicited new victims. Park pled guilty to commodities fraud on the basis of these facts in a separate criminal proceeding, and admitted to the same facts in the current case. ECF No. 50 (Consent Order).

Park now argues that, because the court in her criminal proceedings found her fraud serious enough to warrant a three-year prison sentence, three years of supervised release, and full restitution to her victims, Park should not have to pay a substantial civil monetary penalty ("CMP"). Park also points to her "less than zero" net worth and "weak" financial outlook as

reasons for this Court not to impose a substantial CMP.  Park proposes that she should pay instead only $50,000, or 0.2% of the total amount of her fraud.

The Court should reject Park's arguments, because each would lead to perverse incentives and absurd results.  While this Court has broad discretion to fashion an appropriate CMP, the amount of CMP should be "rationally related to the offense charged or the need for deterrence."  *CFTC v. Yorkshire Group Inc.*, 2016 WL 8256380 at *6 (E.D.N.Y. Aug. 19, 2016) (Slip Copy) (quoting *CFTC v. Levy*, 541 F.3d 1102, 1112 (11th Cir. 2008)).  A $5.22 million CMP is an appropriate and necessary penalty given the enormity of Park's fraud, the amount of time she successfully concealed her fraud, and the grave harm she has caused her victims.

Plaintiff Commission arrived at the $5.22 million CMP having considered all of the circumstances Park describes in her March 28, 2018 letter to the Court (ECF No. 56).  We agreed to offset the restitution in this case with any restitution that Park would make in the criminal case.  Moreover, while Section 6c(d)(1) of the Commodity Exchange Act, 7 U.S.C. § 13a-1(d)(1)(2012), authorizes the Commission to seek a CMP that is triple the amount of Park's illicit monetary gain—which amounts to $69 million[1]—the Commission is instead seeking a far lower amount of $5.22 million in light of the criminal sentence and restitution Park already received.

Two particular factors in this case support a substantial CMP.  *First*, the harm caused by Park to her victims was "staggering".  Ex. 1 (Tr., Park's Sentencing Hr'g), 47:6-8.  Park's victims were not wealthy investors with large assets.  Instead, the victims were the elderly who

---

[1] Park argues that she had no "gain" from the Ponzi scheme because she lost the bulk of the funds through reckless trading.  This is not an appropriate method of calculation.  *See, e.g. CFTC v. Am. Bullion Exch. ABEX Corp.* (*hereinafter "ABEX"*), 2014 WL 3896023, at *18 (C.D. Cal. Aug 7 2014); *CFTC v. Premium Income Corp.*, 2007 WL 429092, at *12 (N.D. Tex. Jan. 26, 2007).  The funds Park received from investors are her "gain" because she obtained the funds through fraud.  It does not matter whether she then chose to use her ill-gotten gains to pay for personal expenses, to gamble away through reckless trading, or to pay out redemptions to investors in order to perpetrate the deception.  In any event, the Commission is seeking a CMP triple the $1.74 million that Park misappropriated to pay for personal expenses rather than the full $23 million she took in.

invested their retirement savings, immigrants who worked for decades to save for a nest egg, a quadriplegic who lost funds meant for his medical care, middle-class workers who took out mortgages against their houses and liquidated their IRAs in order to invest with Park. Ex. 1, 21:10-24:15.  As the criminal court observed when imposing the sentence:

> [W]hile we can calculate the harm in dollars, for some, that harm is immeasurable.  The loss of livelihood, of savings, of college funds, the precious fruits of hard labor from your victims, that they had hoped to pass on to their children and their grandchildren.  For one victim, [Park] stole the stability that he had worked for over 50 years to build, and the peace that he expected to have at the age of 75 that he no longer has.  From another, . . . who is wheelchair bound[,] [Park] stole not only $4 million intending to pay for medical care, but left a permanent devastation that is physical, emotional, spiritual and psychological.

Ex. 1, 47:20-48:7.

*Second*, that this fraud had gone undetected for six years underlines the great need for effective general deterrence and weighs heavily in favor of a substantial CMP.  Park was able to successfully conceal her ongoing fraud because she preyed upon people who trusted her most, because she is sophisticated, persuasive, and adept at deploying her Harvard education and impressive professional credentials to lend herself an aura of legitimacy, and because, as the sentencing judge found, she carried out the fraud in a particularly "cold, calculating manner". Ex. 1, 50:20-25.  For those reasons, this type of affinity fraud is often difficult to detect, and "the temptation to engage in such practices may be great".  *Reddy v. CFTC*, 191 F.3d 109, 124 (2d Cir. 1999) ("[S]ubstantial penalties may be necessary" when gains from an offense is great and "the danger of detection seems low".).  A substantial penalty of $5.22 million is necessary here to deter other would-be offenders who may be tempted to engage in similar conduct.

Although Park argued in her criminal proceedings that she should receive *no* prison sentence—a position rejected by the court—Park now claims that her prison sentence is a reason

not to impose a substantial CMP in this case.  Contrary to Park's contention, a prison sentence and a civil fine are not mutually exclusive, and courts routinely impose substantial CMPs on defendants who have been sentenced to significant prison terms.  *See, e.g. SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 436 (S.D.N.Y. 2011) (imposing a $92.8 million CMP after defendant was sentenced to 11 years in prison and ordered to pay more than $53.8 million in forfeiture of illicit gains and $10 million in criminal fines); *SEC v. Rosenthal,* 2011 U.S. App. LEXIS 11732, at *6-7 (2d Cir. Jun. 9, 2011) (district court did not abuse its discretion in imposing civil penalty equal to two times the defendants' illegal insider trading profits where defendants already sentenced to 60 month and 33 month prison terms and $100,000 and $75,000 criminal fines).

Civil monetary penalties under the CEA "signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed violations intentionally. Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost."  *CFTC v. Rolando*, 589 F. Supp. 2d 159, 173 (D. Conn. 2008) (citation omitted).  Park's fraud not only caused enormous personal damages to her victims, it also "violated core provisions of the Act's regulatory system", harmed the futures markets and eroded public confidence in these markets.  *JCC Inc. v. CFTC*, 63 F.3d 1557, 1571 (11th Cir. 1995).  Deterring such conduct "go[es] to the heart of the purpose of the CEA".  *ABEX*, 2014 WL 3896023 at *18.  To allow Park to escape a substantial CMP would be antithetical to the deterrence purpose of the CEA.

Incredibly, Park claims that a $5.22 million CMP would deprive her of the ability to contribute financially to her family.  Aside from the irony that Park has deprived her victims of the very same things, imposing a low CMP on this basis would create perverse incentives, since

Park herself created the financial situation that she now claims she is in.  As the criminal court noted, this is not "a one-time scheme with a loss amount" but "a fraud that was perpetrated day in and day out over years in a meticulous and intentional manner against so many trusting victims". Ex. 1, 49:21-50:1.  As is typical in a Ponzi scheme, the rate of loss in this case accelerated as time went on.  Over the course of six years, Park could have chosen to stop at many points and incurred far smaller losses.[2]  She elected not to do so.  The financial situation Park is now in—both the restitution she is obligated to make and the supposed lack of financial resources—is one entirely of her own creation.

While this Court may take ability to pay into account when imposing CMPs, that factor is far from the only consideration.  *See, e.g., CFTC v. Paragon Fx Enters.*, 2015 WL 2250390 at *5 (S.D.N.Y. Feb. 2, 2015) (enumerating factors courts should consider when imposing CMPs, including regulatory aims of the statute, *scienter*, harm caused by the misconduct, post-violation conduct, and ability to pay).  Allowing ability to pay to dictate the amount of CMP in serious fraud cases like this one would paradoxically and unjustly impose a lighter punishment on those who caused the greatest harm.  It would also incentivize offenders to attempt to intentionally or recklessly destroy or offload assets in order to create a situation in which they can claim poverty.

For the above reasons and for the reasons stated in its Memorandum of Law, the Commission respectfully requests that the Court impose a $5.22 million CMP on Park and the corporate defendants controlled by Park.

---

[2] For example, in February 2015, 16 months before Park was arrested, Park had incurred losses of $10.13 million. Consent Order ¶ 33.  Had Park chosen to cease her fraud then, the loss from her Ponzi scheme would have been curbed at less than half the amount that it eventually grew to.  Instead, Park continued to solicit investors, inducing an investor to transfer a total of $4 million to Park.  Consent Order ¶¶ 33-35.  In the last six months of her trading, Park lost more than $3 million dollars but continued to solicit funds from new investors.  Consent Order ¶¶ 38-39.